**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STUART SWAZIEK, derivatively on behalf of DISCOVER FINANCIAL SERVICES, <br><br> Plaintiff, <br><br> vs. <br><br> ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, JEFFREY S. ARONIN, GREGORY C. CASE, CANDACE H. DUNCAN, JOSEPH F. EAZOR, MARY K. BUSH, CYNTHIA A. GLASSMAN, MICHAEL H. MOSKOW, THOMAS G. MAHERAS, DAVID L. RAWLINSON II, MARK A. THIERER, and JENNIFER L. WONG, <br><br> Defendants, <br><br> and <br><br> DISCOVER FINANCIAL SERVICES, <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:** <br><br> **(1) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** <br> **(2) BREACH OF FIDUCIARY DUTY;** <br> **(3) UNJUST ENRICHMENT;** <br> **(4) ABUSE OF CONTROL;** <br> **(5) GROSS MISMANAGEMENT; AND** <br> **(6) WASTE OF CORPORATE ASSETS** <br><br> JURY TRIAL DEMANDED |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Stuart Swaziek ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Discover Financial Services ("Discover" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Roger C. Hochschild ("Hochschild"), John T. Greene ("Greene"), R. Mark Graf ("Graf"), Jeffrey S. Aronin ("Aronin"), Gregory C. Case ("Case"), Candace H. Duncan

1

("Duncan"), Joseph F. Eazor ("Eazor"), Mary K. Bush ("Bush"), Cynthia A. Glassman ("Glassman"), Michael H. Moskow ("Moskow"), Thomas G. Maheras ("Maheras"), David L. Rawlinson II ("Rawlinson"), Mark A. Thierer ("Thierer"), and Jennifer L. Wong ("Wong") (collectively, the "Individual Defendants," and together with Discover, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Discover, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Discover, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Discover's directors and officers from February 21, 2019 to August 14, 2023 (the "Relevant Period").

2.     Discover is a financial services company split into two segments, Digital Banking and Payment Services. Digital Banking encompasses consumer banking and lending products such as credit cards, private student loans, personal loans, home loans,

and deposit products. Payment Services encompasses the PULSE network which allows financial institutions to issue debit cards to access ATMs and Diners Club International, which is a global payments network of financial institutions that issue Diners Club branded charge cards.

3.     Since Discover is a bank holding company under the Bank Holding Company Act of 1956, as well as a financial holding company under the Gramm-Leach-Bliley Act, the Company is subject to regulatory oversight by the Board of Governors of the Federal Reserve System (the "Federal Reserve") and is subject to heightened risk management, compliance, and internal controls procedures.

4.     During the Relevant Period, Defendants publicly maintained that Discover operated a formidable risk management program and utilized sophisticated compliance procedures, especially with regard to the Company's consumer credit card and private student loan divisions.

5.     Also during the Relevant Period, Discover's Board of Directors (the "Board") facilitated an immense share repurchase program. Indeed, between March 2021 and June 2023, the Company repurchased over 58 million shares of its own stock at a cost of *over $6.4 billion*.

6.     On July 20, 2022, Discover issued a press release announcing the Company's financial results for the second quarter of 2022. Among other things, the press release revealed that Discover would be "suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters." The press release also stated that

"[t]he investigation is ongoing and is being conducted by a board-appointed independent special committee."

7.     On this news, the price per share of Discover stock fell $9.80, or 8.93%, from its closing price on July 20, 2022 of $109.80 per share to close on July 21, 2022 at $100.00 per share.

8.     Almost one year later to the day, on July 19, 2023, Discover issued a press release announcing the Company's financial results for the second quarter of 2023. Among other things, the press release revealed that Discover misclassified certain credit card products over an approximate fifteen-year period due to an admitted compliance failure. In particular, Discover stated that, around halfway through 2007, the Company began misclassifying certain credit card accounts by misplacing customers into the Company's highest merchant and merchant acquirer pricing tier. The press release also revealed that the Federal Deposit Insurance Corporation ("FDIC") had sent a proposed consent order to Discover regarding an unrelated regulatory matter.

9.     On this news, the price per share of Discover stock fell $19.40, or 15.92%, from its closing price on July 19, 2023 of $121.85 per share to close on July 20, 2023 at $102.45 per share.

10.     Just weeks later, on August 14, 2023, Discover issued another press release, this time announcing that the Board and Defendant Hochschild "have agreed that Hochschild will step down as Chief Executive Officer and President and as a member of the Board," effective immediately. The press release included a statement from Defendant Maheras, the Chair of the Board, who represented that "[t]he Board is continuously focused

on Discover reaching its full potential across the business, ***including our commitment to enhancing compliance, risk management and corporate governance***." (Emphasis added.)

11.     The same day, August 14, 2023, Discover disclosed in an exhibit attached to a Form 8-K filed with the SEC that the Company's credit card delinquency rate increased to 3.00% for the twenty-four-month period ending July 31, 2023, which was considerably higher than the 2.86% rate the Company had for the twenty-four-month period ending June 31, 2023.

12.     *Seeking Alpha* reported that same day that this newly disclosed 3.00% credit card delinquency rate was significantly higher than Discover's pre-pandemic rate of 2.37% in July 2019.

13.     The next day, on August 15, 2023, *Seeking Alpha* published an article titled, "Discover Financial stock sinks on sudden CEO exit amid regulatory concerns." The article connected Defendant Hochschild's abrupt resignation to Discover's newly disclosed regulatory and compliance problems.

14.     On this news, the price per share of Discover stock fell $9.69, or 9.44%, from its closing price on August 14, 2023 of $102.65 per share to close on August 15, 2023 at $92.96 per share.

15.     Two days later, on August 17, 2023, during an earnings call with investors and analysts, Discover's highest officers admitted that the Company was "paying the price" for having failed to invest enough in compliance and maintained that Defendant Hochschild's swift demise signaled a new commitment to compliance. With these admissions, Defendants effectively corroborated *Seeking Alpha*'s concerns from the August 15, 2023 article.

16.     During the Relevant Period, the investing public was under a false impression of the Company's business, operations, and financial success.

17.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Discover to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between March 2021 and June 2023, approximately 58,004,324 shares of Discover common stock were repurchased, costing the Company over $6.4 billion. As the Company's stock was actually worth only $92.96 per share, the price at which it was trading when markets closed on August 15, 2023, the Company overpaid for repurchases of its own stock by ***over $1.0 billion in total***.

18.     In breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

19.     Moreover, during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Discover, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) Discover did not have sufficient or effective risk management or compliance controls and procedures; (2) as a result, Discover failed to comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the

Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

20.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

21.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its Executive Vice President ("EVP"), Chief Financial Officer ("CFO"), and its former EVP, CFO to a federal securities fraud class action lawsuit pending in this Court (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

22.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) and 78t-1, and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

25.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

26.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

27.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

28.     Plaintiff is a current shareholder of Discover. Plaintiff has continuously held Discover common stock since January 24, 2020.

**Nominal Defendant Discover**

29.     Discover is a Delaware corporation with its principal executive offices at 2500 Lake Cook Road, Riverwoods, Illinois 60015. Discover's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DFS."

**Defendant Hochschild**

30.     Defendant Hochschild served as the Company's President, CEO, and as a director from October 2018 until his resignation on August 14, 2023. Previously, he served as President and Chief Operating Officer from 2004 to 2018. According to the Company's Schedule 14A filed with the SEC on March 17, 2023 (the "2023 Proxy Statement"), as of March 13, 2023, Defendant Hochschild beneficially owned 931,231 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Hochschild owned approximately $90.8 million worth of Discover stock.

31.     For the fiscal year ended December 31, 2022 ("2022 Fiscal Year"), Defendant Hochschild received $10,642,075 in compensation from the Company. This included $1,100,000 in salary, $8,000,133 in stock awards, $1,196,250 in non-equity incentive plan compensation, and $345,692 in all other compensation. For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Hochschild received $12,087,218 in compensation from the Company. This included $1,100,000 in salary, $7,600,006 in stock awards, $3,190,000 in non-equity incentive plan compensation, and $197,212 in all other compensation. For the fiscal year ended December 31, 2020 ("2020 Fiscal Year"), Defendant Hochschild received $10,357,259 in compensation from the Company. This included $1,118,539 in salary, $7,350,078 in stock awards, $1,771,000 in

non-equity incentive plan compensation, $49,654 in change in pension value and NQDC earnings, and $67,988 in all other compensation. For the fiscal year ended December 31, 2019 ("2019 Fiscal Year"), Defendant Hochschild received $9,250,436 in compensation from the Company. This included $927,135 in salary, $6,500,016 in stock awards, $1,700,000 in non-equity incentive plan compensation, $50,585 in change in pension value and NQDC earnings, and $72,700 in all other compensation.

32.     The Company's Schedule 14A filed with the SEC on March 25, 2022 (the "2022 Proxy Statement") stated the following about Defendant Hochschild:

> Mr. Hochschild has served as the chief executive officer and president of Discover since October 2018 and served as our president and chief operating officer from 2004 to 2018. He was executive vice president, chief administrative and strategic officer for Morgan Stanley from 2001 to 2004, and was executive vice president, chief marketing officer - Discover from 1998 to 2001, when Discover was a part of Morgan Stanley.
>
> **In addition**
>
> Mr. Hochschild's deep understanding of the Company's business and the financial services industry provides valuable expertise to the Company. He also brings leadership experience in risk management, consumer financial services, information technology and knowledge of operations and the day-to-day management of a global financial corporation, which plays a critical role in board discussions regarding strategic planning and business development for the Company.

### Defendant Greene

33.     Defendant Greene has served as the Company's EVP, CFO since September 2019. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Greene beneficially owned 35,531 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Greene owned approximately $3.5 million worth of Discover stock.

34.     For the 2022 Fiscal Year, Defendant Greene received $4,528,276 in compensation from the Company. This included $700,000 in salary, $2,275,211 in stock awards, $1,507,275 in non-equity incentive plan compensation, and $45,790 in all other compensation. For the 2021 Fiscal Year, Defendant Greene received $4,540,308 in compensation from the Company. This included $700,000 in salary, $2,275,118 in stock awards, $1,522,500 in non-equity incentive plan compensation, and $42,690 in all other compensation. For the 2020 Fiscal Year, Defendant Greene received $3,993,629 in compensation from the Company. This included $726,923 in salary, $2,389,093 in stock awards, $845,000 in non-equity incentive plan compensation, and $32,613 in all other compensation. For the 2019 Fiscal Year, Defendant Greene received $1,508,181 in compensation from the Company. This included $169,615 in salary, $1,000,001 in stock awards, $326,000 in non-equity incentive plan compensation, and $12,565 in all other compensation.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Greene made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| February 15, 2022 | 4,443 | $127.95 | $568,464 |

Thus, in total, before the fraud was exposed, he sold 4,443 shares of Company stock on inside information, for which he received approximately $568,464 in proceeds. His insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

36.     The Company's website states the following about Defendant Greene:

John T. Greene joined Discover in September 2019 as executive vice president, chief financial officer. Prior to joining Discover, John served as executive vice president, chief financial officer and treasurer at Bioverativ, a global biopharmaceutical company. From 2014 to 2016, he was chief financial officer for Willis Group Holdings, which was preceded by more than eight years at HSBC Holdings where he held CFO positions for several divisions, including retail bank and wealth management; insurance and consumer and mortgage lending. He also held various CFO roles in his 12-year tenure with General Electric from 1993 to 2005. John holds a bachelor's degree in accounting from the State University of New York and a master's degree in Business Administration from the Kellogg School of Management at Northwestern University.

**Defendant Graf**

37.     Defendant Graf served as the Company's EVP, CFO from 2011 until September 2019. For the 2019 Fiscal Year, Defendant Graf received $3,703,330 in compensation from the Company. This included $700,000 in salary, $2,100,042 in stock awards, $875,000 in non-equity incentive plan compensation, and $28,288 in all other compensation.

**Defendant Aronin**

38.     Defendant Aronin has served as a Company director since September 2007. He also serves as a member of the Compensation and Leadership Development Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Aronin beneficially owned 74,864 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Aronin owned approximately $7.3 million worth of Discover stock.

39.     For the 2022 Fiscal Year, Defendant Aronin received $290,067 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Aronin received

$265,105 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Aronin received $265,016 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Aronin received $264,990 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $149,990 in stock awards.

40.    The Company's 2022 Proxy Statement stated the following about Defendant Aronin:

> Mr. Aronin is the founder, chairman and chief executive officer of Paragon Biosciences, a global life science innovator that creates, builds, and funds biology-based companies. Since 2017 under Paragon, Mr. Aronin has established seven portfolio companies—Harmony Biosciences (Nasdaq: HRMY), Castle Creek Biosciences, Emalex Biosciences, Evozyne, Qlarity Imaging, CiRC Biosciences, and Skyline Biosciences—and serves as their chairman of the board. Prior to Paragon, Mr. Aronin was CEO of several global biopharmaceutical companies focused on therapies for people with high unmet medical needs.

> **In addition**

> Mr. Aronin has experience as a chief executive officer leading several global biopharmaceutical companies. His skills include strategy and business development, finance and brand marketing. He brings valuable leadership experience and knowledge in the operations and day-to-day management of a global corporation in a regulated industry. Mr. Aronin also has experience in the structuring and execution of strategic corporate transactions, including mergers and acquisitions.

### Defendant Case

41.    Defendant Case has served as a Company director since 2007. He also serves as the Chair of the Compensation and Leadership Development Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Case beneficially owned 74,864 shares of the Company's common stock. Given that the price

per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Case owned approximately $7.3 million worth of Discover stock.

42.     For the 2022 Fiscal Year, Defendant Case received $300,067 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Case received $280,105 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Case received $280,016 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Case received $279,990 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $149,990 in stock awards.

43.     The Company's 2022 Proxy Statement stated the following about Defendant Case:

> Mr. Case has been chief executive officer of Aon plc, a leading global professional services firm providing advice and solutions in risk, retirement and health, since 2005 and was president from 2005 to 2018. He is also a member of Aon's board of directors. Prior to joining Aon, Mr. Case was with McKinsey & Company, an international management consulting firm, for 17 years, most recently serving as head of the Financial Services Practice.

> **In addition**

> Mr. Case has approximately 20 years of experience in the insurance and financial services industries, including in the areas of risk management services, insurance and reinsurance brokerage, and through his management consulting and banking experience. He brings valuable leadership experience and knowledge of business operations and the day-to-day management of a large, regulated global financial corporation. His skills include strategy and business development, risk management and people management.

**<u>Defendant Duncan</u>**

44. Defendant Duncan has served as a Company director since 2014. She also serves as a member of the Audit Committee and as a member of the Nominating, Governance and Public Responsibility Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Duncan beneficially owned 19,848 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Duncan owned approximately $1.9 million worth of Discover stock.

45. For the 2022 Fiscal Year, Defendant Duncan received $325,067 in compensation from the Company. This included $155,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Duncan received $280,105 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Duncan received $280,016 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Duncan received $279,990 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $149,990 in stock awards.

46. The Company's 2022 Proxy Statement stated the following about Defendant Duncan:

> Ms. Duncan retired from KPMG LLP, a global network of professional firms providing audit, tax and advisory services, in November 2013 where she had been managing partner of the Washington, D.C. metropolitan area since 2009. Ms. Duncan also was on the KPMG LLP board of directors from 2009 to 2013, and served as chair of the board's nominating committee as well as the partnership and employer of choice committee. Prior thereto, she served in various roles at the firm, including managing partner for audit for the Midatlantic area and audit partner in charge for the Virginia business unit. Ms. Duncan served on the board of FTD Companies, Inc. from 2014 to 2019.

**In addition**

Ms. Duncan has experience leading and managing a large accounting firm's growth priorities across its audit, tax and advisory functions in key markets. She also has a strong financial and accounting background, gained through her many years of experience at KPMG LLP, including her experience as a lead audit partner for major international and domestic companies. She has served clients on a wide range of accounting and operational issues, public securities issuances and strategic corporate transactions. Her thorough knowledge of public company accounting, financial statements and corporate finance is of significant value to the Company.

**<u>Defendant Eazor</u>**

47.     Defendant Eazor has served as a Company director since 2016. He also serves as a member of the Audit Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Eazor beneficially owned 11,470 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Eazor owned approximately $1.1 million worth of Discover stock.

48.     For the 2022 Fiscal Year, Defendant Eazor received $295,067 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Eazor received $275,105 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Eazor received $275,016 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Eazor received $274,990 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $149,990 in stock awards.

49. The Company's 2022 Proxy Statement stated the following about Defendant Eazor:

> Mr. Eazor currently serves as the president and chief executive officer of Clario (formerly ERT and Bioclinica), a global data and technology company for clinical trials. Prior to assuming this role in October 2020, he served as president and chief executive officer of Conifer Health Solutions, LLC, a healthcare business solutions organization, from January to August 2020. Mr. Eazor was executive vice president and chief customer officer of computer software company Oracle Corporation, from July 2019 to January 2020, and chief executive officer of Rackspace, a leading managed cloud company, from 2017 to 2019. Mr. Eazor previously served as the president and chief executive officer of EarthLink, Inc., a leading communications and IT services provider, and was a member of EarthLink's board from 2014 to 2017. From 2011 to 2013, he served as executive vice president and chief operating officer of global sales and customer operations at EMC and prior to that he served in a variety of leadership roles at Hewlett Packard and Electronic Data Systems. Mr. Eazor also served on the board of Commvault, a data protection and information management company, from 2015 to 2018.

> **In addition**

> Mr. Eazor has a proven track record of leading successful global companies. He has extensive experience in international strategy and business development and in technology and IT services. In addition to his corporate roles, Mr. Eazor has management consulting experience from his time as a senior partner with McKinsey & Co. and as a partner and board member of A.T. Kearney, Inc.

**<u>Defendant Bush</u>**

50. Defendant Bush served as a Company director from 2007 until she resigned on June 2, 2023. She also served as the Chair of the Nominating, Governance and Public Responsibility Committee and as a member of the Risk Oversight Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Bush beneficially owned 55,000 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Bush owned approximately $5.4 million worth of Discover stock.

51.     For the 2022 Fiscal Year, Defendant Bush received $315,067 in compensation from the Company. This included $145,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Bush received $295,105 in compensation from the Company. This included $145,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Bush received $290,016 in compensation from the Company. This included $140,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Bush received $279,990 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $149,990 in stock awards.

52.     The Company's 2022 Proxy Statement stated the following about Defendant Bush:

> Ms. Bush has served as the chairman of Bush International, LLC, a financial and business strategy advisory firm, since 1991. The firm advises U.S. companies and foreign governments on financial markets, banking and strategic business and economic matters. Ms. Bush was the inaugural head and managing director of the Federal Housing Finance Board, where she established financial policies and oversaw management and safety and soundness for the nation's Federal Home Loan Banks. She also founded and served as the head of the international finance department of Fannie Mae, where she led funding transactions globally, and was appointed by President Reagan as the U.S. Alternate Executive Director of the International Monetary Fund Board. Ms. Bush served on the board of Marriott International, Inc. from 2008 to 2020.

> **In addition**

> Ms. Bush brings extensive leadership experience in banking, international finance, corporate governance and public policy to the Board. Additionally, she brings deep experience in corporate finance and strategy and the operations and regulation of financial services businesses.

> **Defendant Moskow**

53.     Defendant Moskow served as a Company director from 2007 until his retirement on May 11, 2023. He also served as the Chair of the Risk Oversight Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Moskow beneficially owned 51,596 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Moskow owned approximately $5 million worth of Discover stock.

54.     For the 2022 Fiscal Year, Defendant Moskow received $305,067 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Moskow received $285,105 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Moskow received $285,016 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Moskow received $284,990 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $149,990 in stock awards.

55.     The Company's 2022 Proxy Statement stated the following about Defendant Moskow:

> Mr. Moskow is currently Vice Chair and Distinguished Fellow, Global Economy at The Chicago Council on Global Affairs. He retired as president and chief executive officer of the Federal Reserve Bank of Chicago in 2007, where he had served since 1994. Mr. Moskow was a Deputy U.S. Trade Representative, following his appointment by President Bush in 1991, and earlier in his career, held a number of senior positions with the U.S. government, including Undersecretary of Labor at the U.S. Department of Labor, director of the Council on Wage and Price Stability and senior staff economist with the Council of Economic Advisers. Mr. Moskow serves on the board of Flowstone Private Equity Opportunity Fund. He served on the

board of CityBase until early 2019 and on the board of Commonwealth Edison Company, a subsidiary of Exelon Corporation, until 2021.

**In addition**

Mr. Moskow brings extensive regulatory, risk management, financial services and banking experience to the Board and has extensive knowledge of the economy and financial markets. Through his senior regulatory positions, particularly in the financial services arena, and service on the boards of other financial institutions, he brings a thorough and insightful perspective to a wide range of issues.

**Defendant Glassman**

56.     Defendant Glassman served as a Company director from 2009 until her retirement on May 11, 2023. She also served as the Chair of the Audit Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Glassman beneficially owned 47,605 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Glassman owned approximately $4.6 million worth of Discover stock.

57.     For the 2022 Fiscal Year, Defendant Glassman received $325,067 in compensation from the Company. This included $155,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Glassman received $285,105 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Glassman received $285,016 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Glassman received $284,990 in compensation from the Company. This included $135,000 in fees earned or paid in cash and $149,990 in stock awards.

58. The Company's 2022 Proxy Statement stated the following about Defendant Glassman:

> Dr. Glassman was appointed by President Bush as Under Secretary for Economic Affairs at the U.S. Department of Commerce from 2006 to 2009 and as Commissioner of the U.S. Securities and Exchange Commission from 2002 to 2006, including serving as Acting Chair during the summer of 2005. Dr. Glassman is currently a member of the Dow Jones Special Committee. She held various positions during her 12 years at the Federal Reserve, including as Chief of the Financial Reports Section and an Economist in the Capital Markets Section. She also has more than 15 years of experience in financial services consulting, including as a Principal of Ernst & Young LLP and Managing Director of Furash & Company. Dr. Glassman served on the board of Navigant Consulting, Inc. from 2009 to 2019, and was a Senior Research Scholar at the Institute for Corporate Responsibility at the George Washington University School of Business from 2009 to 2021.

> **In addition**

> Dr. Glassman brings extensive regulatory, corporate governance, risk management, financial services and banking experience to the Board. She holds a Ph.D. in economics and has spent over 45 years in the public and private sectors focusing on financial services regulatory and public policy issues.

### **Defendant Maheras**

59. Defendant Maheras has served as a Company director since 2008 and as Independent Chairman since May 2020. He also serves as a member of the Risk Oversight Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Maheras beneficially owned 59,789 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Maheras owned approximately $5.8 million worth of Discover stock.

60. For the 2022 Fiscal Year, Defendant Maheras received $505,067 in compensation from the Company. This included $335,000 in fees earned or paid in cash

and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Maheras received $485,105 in compensation from the Company. This included $335,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Maheras received $415,016 in compensation from the Company. This included $265,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Maheras received $274,990 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $149,990 in stock awards.

61.     The Company's 2022 Proxy Statement stated the following about Defendant Maheras:

> Mr. Maheras has been the managing partner of Tegean Capital Management, LLC since 2008, and a partner of Iron Park Capital Management, LLC since 2019, two investment advisory firms based in New York. Prior to that, he was chairman and co-chief executive officer of Citi Markets and Banking, the investment banking division of Citigroup, Inc., where he held roles of increasing responsibility after starting his career as a fixed-income trader at Salomon Brothers. He has served as chairman of the U.S. Treasury Department Borrowing Advisory Committee and as an executive committee member of the Board of Directors of the Securities Industry and Financial Markets Association.

> **In addition**

> Mr. Maheras has extensive risk management, banking and capital markets experience, including 23 years at Citigroup, Inc. where his responsibilities included leading the global capital markets business. He also brings valuable leadership experience and knowledge of operations and the day-to-day management of a global financial services organization. Mr. Maheras' financial background and banking and financial services experience includes a knowledge of financial statements, corporate finance, accounting and capital markets.

### Defendant Rawlinson

62.     Defendant Rawlinson has served as a Company director since February 2021. He also serves as a member of the Audit Committee. According to the Company's

2023 Proxy Statement, as of March 13, 2023, Defendant Rawlinson beneficially owned 3,319 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Rawlinson owned approximately $323,669 worth of Discover stock.

63.     For the 2022 Fiscal Year, Defendant Rawlinson received $295,067 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Rawlinson received $302,271 in compensation from the Company. This included $114,583 in fees earned or paid in cash and $187,688 in stock awards.

64.     The Company's 2022 Proxy Statement stated the following about Defendant Rawlinson:

> Mr. Rawlinson has been the president and chief executive officer of Qurate Retail, Inc., an e-commerce company, since October 2021, and previously served as president and chief executive officer-elect for Qurate Retail, Inc. since August 2021. From February 2020 to August 2021, Mr. Rawlinson served as chief executive officer of NielsenIQ (formerly Nielsen Global Connect), a global data company. From November 2015 until joining Nielsen's management, he served as president of the Global Online Business at W.W. Grainger, Inc., an industrial supplies company. Mr. Rawlinson joined Grainger in July 2012 and previously served as the vice president of operations for the Global Online Business, and prior to that, vice president, deputy general counsel and corporate secretary of Grainger. Mr. Rawlinson worked for ITT Exelis (formerly ITT Corp.) from 2009 to 2012, most recently as vice president, general counsel and director of corporate responsibility of the Electronic Systems division. Prior to that, he served as a White House Fellow and in appointed positions for both the George W. Bush and Obama administrations. Mr. Rawlinson served on the board of MonotaRO Co., Ltd. from 2014 to 2019 and on the board of Nielsen Holdings plc from 2017 to 2021.

> **In addition**

> Mr. Rawlinson has significant experience in global e-commerce, consumer trends, consumer data, and digital business-to-business operations. In addition to his background in information solutions, Mr. Rawlinson brings

deep leadership experience on a global scale and adds another expert perspective to the Board with his track record of success in digital commerce.

**Defendant Thierer**

65. Defendant Thierer has served as a Company director since 2013. He also serves as a member of the Compensation and Leadership Development Committee and as a member of the Nominating, Governance and Public Responsibility Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Thierer beneficially owned 22,789 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Thierer owned approximately $2.2 million worth of Discover stock.

66. For the 2022 Fiscal Year, Defendant Thierer received $300,067 in compensation from the Company. This included $130,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Thierer received $270,105 in compensation from the Company. This included $120,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Thierer received $268,349 in compensation from the Company. This included $118,333 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant Thierer received $264,990 in compensation from the Company. This included $115,000 in fees earned or paid in cash and $149,990 in stock awards.

67. The Company's 2022 Proxy Statement stated the following about Defendant Thierer:

Mr. Thierer currently serves as the managing partner of AssetBlue Investment Group, a position he has held since June 2017. From October 2017 through February 2018, Mr. Thierer also served as the interim chief executive officer of Dentsply Sirona Inc., a manufacturer of dental implants.

Mr. Thierer was chief executive officer of OptumRx, a pharmacy care services company, from July 2015 until September 2017. He previously served as chairman and chief executive officer of Catamaran Corporation, one of the nation's largest pharmacy benefit management companies, from March 2011 until it combined with OptumRx in 2015.

**In addition**

Mr. Thierer has experience as a chief executive officer leading a national pharmacy benefit and healthcare information technology solutions company. His skills include strategy and business development, technology, finance and marketing. He brings valuable leadership experience and knowledge of operations and the day-to-day management of a national corporation. Mr. Thierer also has experience in the structuring and execution of strategic corporate transactions, including mergers and acquisitions.

## **Defendant Wong**

68.     Defendant Wong has served as a Company director since 2019. She also serves as a member of the Risk Oversight Committee. According to the Company's 2023 Proxy Statement, as of March 13, 2023, Defendant Wong beneficially owned 8,280 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 13, 2023 was $97.52, Defendant Wong owned approximately $807,466 worth of Discover stock.

69.     For the 2022 Fiscal Year, Defendant Wong received $295,067 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $170,067 in stock awards. For the 2021 Fiscal Year, Defendant Wong received $275,105 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $150,105 in stock awards. For the 2020 Fiscal Year, Defendant Wong received $275,016 in compensation from the Company. This included $125,000 in fees earned or paid in cash and $150,016 in stock awards. For the 2019 Fiscal Year, Defendant

Wong received $187,476 in compensation from the Company. This included $62,500 in fees earned or paid in cash and $124,976 in stock awards.

70.     The Company's 2022 Proxy Statement stated the following about Defendant Wong:

> Ms. Wong has been the chief operating officer of Reddit, Inc., a community and discussion platform, since 2018, where she oversees business strategy and growth, and related teams for the company. She previously served as Time, Inc.'s president of digital and then its chief operating officer from 2016 to 2018, where she led growth strategy and digital business transformation. Prior to that, Ms. Wong held the role of chief business officer from 2011 to 2015 at Popsugar, Inc., a media and technology company, where she led business operations and the company's media and commerce businesses. Earlier in her career, Ms. Wong held several executive management roles at AOL and worked with a range of digital media and technology clients at McKinsey & Company.

> **In addition**

> Ms. Wong has experience building digital products and platforms, and an understanding of digital and social media as an essential marketing tool. In addition to her extensive digital and marketing experience, her skills include business strategy and growth development, risk management, and technology.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

71.     By reason of their positions as officers and/or directors of Discover and because of their ability to control the business and corporate affairs of Discover, the Individual Defendants owed Discover and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Discover in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Discover and its shareholders so as to benefit all shareholders equally.

72.     Each director and officer of the Company owes to Discover and its shareholders the fiduciary duty to exercise good faith and diligence in the administration

of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Discover, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers and directors of Discover were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Discover, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Discover's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

77.     To discharge their duties, the officers and directors of Discover were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Discover were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Illinois, and the United States, and pursuant to Discover's own Code of Ethics and Business Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Discover conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Discover and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Discover's operations would comply with all applicable laws and Discover's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.     Each of the Individual Defendants further owed to Discover and the shareholders the duty of loyalty requiring that each favor Discover's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Discover and were at all times acting within the course and scope of such agency.

80.    Because of their advisory, executive, managerial, and directorial positions with Discover, each of the Individual Defendants had access to adverse, non-public information about the Company.

81.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Discover.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

82.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

83.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act.

84.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or

recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Discover was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Discover and was at all times acting within the course and scope of such agency.

## DISCOVER'S CODE OF ETHICS

87.     The Company's Code of Ethics and Business Conduct (the "Code of Ethics"), "applies to all Directors, Officers, [and] employees" of the Company.

88.     The Code of Ethics provides, as to the requirement to "Protecting Inside Information," in relevant part, that:

> Misuse of non-public information erodes the Company's trustworthiness and places our business and reputation at risk. While working, or providing service, on behalf of the Company, you may become aware of material, non-

public information about the Company or another entity. Material, non-public information (also known as "inside information") is non-public information about the Company, our Consumers or Counterparties that may have an impact on the price of common stock or another financial instrument the Company, another company, or an investor would be likely to consider important in making an investment decision. Information becomes public when it has been effectively disclosed to the public and a reasonable waiting period has passed to allow the information to be absorbed by the marketplace.

The misuse of inside information would be considered a violation of this Code of Ethics.

89.     In relevant part, the Code of Ethics provides, in a section titled "WE ARE TRANSPARENT & FAIR," that:

The Company seeks to outperform its competition fairly and honestly through superior performance. Every Director, Officer, and employee must protect the Company's reputation by dealing fairly with consumers, the public, competitors, suppliers, and one another. No one should take advantage of anyone through manipulation, concealment, abuse of privileged information, or misrepresentation of facts.

90.     The Code of Ethics provides, in a section titled "How We Communicate With the Public," that:

We all have a responsibility under the law to provide accurate and complete disclosure to the investing public, and to the extent that you are involved in the preparation of materials for dissemination to the public, you must ensure that the information is accurate and complete in all material respects. In particular, the Company's Senior Financial Officers, Executive Officers and Directors must endeavor to promote accurate, complete, fair, timely and understandable disclosure in the Company's public communications, including documents that the Company files with or submits to the United States Securities and Exchange Commission and other regulators.

91.     The Code of Ethics provides, as to "Creating & Maintaining Accurate Books & Records," that:

Maintaining accurate and complete books and records is not only a requirement of the Company and the Code of Ethics but also vital for us to be able to measure our successes. Every business transaction undertaken by the Company must be recorded on its books accurately and in a timely

manner. When providing information for these documents, you are responsible for being candid and accurate and will be held responsible for any false or misleading entries made.

In particular, Senior Financial Officers must endeavor to ensure that financial information included in the Company's books and records is correct and complete in all material respects. All Company records should be retained or destroyed according to Company records retention policies and schedules. In accordance with these policies, in the event of litigation, audit or government or Company inquiry, you should consult with the Legal Organization regarding special record retention requirements.

92. The Code of Ethics provides, in a section titled "WE CONDUCT BUSINESS LEGALLY & ETHICALLY," that:

The Company is subject to numerous laws and regulations in a variety of domestic and international jurisdictions. It is your responsibility to understand the laws applicable to your job responsibilities and locations, and to comply with both the letter and the spirit of these laws. This requires that you avoid not only actual misconduct, but also the appearance of impropriety. Assume that any action you take ultimately could be publicized and consider how the Company and you would be perceived. When in doubt, stop and reflect. Ask questions. If you are unclear about the application of the law to your job responsibilities, or if you are unsure about the legality or integrity of a particular course of action, you must seek the advice of your management, the Legal Organization, Corporate Compliance, Internal Audit or Human Resources Business Risk. Any improper or illegal acts committed (or known about) during your employment at, or service to, the Company will be treated as misconduct and a violation of this Code of Ethics.
Certain significant policies, laws and regulations are highlighted below, and additional information may be found in other applicable Company policies and procedures, including the Code of Conduct. This does not constitute a complete listing of the laws, rules, regulations and policies that must be adhered to by every person subject to the Code of Ethics.

93. The Code of Ethics provides, in a section titled "Protecting Our Consumers," that:

We comply with both the letter and the spirit of fair and responsible banking laws and regulations. We are committed to adhering to the regulatory prohibition against unfair, deceptive, or abusive acts or practices and to making financial products and services available to consumers and prospective consumers in a fair and consistent manner. We offer and extend

all of our products and services to any qualified applicant without regard to race, color, religion, national origin, sex, sexual orientation, marital status, familial status, handicap, age (provided the applicant has the legal capacity to enter into a binding contract), the fact that all or part of a consumers or prospective consumers income is derived from any public assistance program, or the fact that a consumer or prospective consumer has-in good faith-exercised any of his or her rights under the Consumer Credit Protection Act. The Company maintains a fair and responsible banking program to ensure compliance with applicable laws and regulations.

94.     In relevant part, the Code of Ethics provides, in a section titled "Avoiding

Conflicts of Interests," that:

The way we conduct ourselves in business impacts our reputation and the trust we maintain with our consumers as well as each other. By recognizing and taking preemptive steps to preventing Conflicts of Interest, we are demonstrating our loyalty to our Company's integrity and our determination to "Do the Right Thing".

95.     In relevant part, the Code of Ethics provides, in a section titled "Reporting

Illegal, Unethical or Improper Conduct," that:

The Company's reputation for integrity depends upon you. You are the Company's first line of defense against civil or criminal liability and unethical business practices. If at any time you suspect your actions or inactions may have violated the law, this Code of Ethics, any of the Company's other policies or if you observe or become aware of any illegal, harassing/discriminatory behaviors, unethical or improper conduct by an Officer, Director, another employee, consumer, consultant, vendor, or third party relating to the Company, you are to promptly notify one of the following:
- Your Management
- Employee Relations
- Chief Legal Officer
- Chief Compliance Officer
- Chief Risk Officer
- Chief Audit Executive

96.     Lastly, the Code of Ethics provides in a section titled "Violations of the

Code of Ethics," that:

To maintain the highest standards of integrity, you must dedicate yourself to complying with the Code of Ethics (including any future amendments),

Company policies, standards and procedures, and applicable laws and regulations. In addition to complying with Company policies, you are assigned to perform duties at or for the Company and expected to satisfactorily meet the requirements of your position. Failure to do so may result in the full range of corrective action available to the Company, up to and including immediate termination, as well as civil and criminal penalties (if applicable). The penalties for regulatory and criminal violations may include significant fines and imprisonment.

The Company reserves the right to investigate and to otherwise ensure compliance with this policy. You are expected to cooperate with personnel authorized to conduct investigations on the Company's behalf which may include requesting that you exit the work environment in order to address an alleged violation.

The Code of Ethics, including any future amendments, forms part of the terms and conditions of your employment at the Company although is not a contract guaranteeing you employment or service for a specific duration or entitling you to any special privileges or benefits.

97.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Ethics by engaging in insider trading. Additionally, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## DISCOVER'S AUDIT COMMITTEE CHARTER

98.     The Company's Audit Committee Charter states that the Audit Committee's "primary responsibility is one of oversight. It is the responsibility of the Company's

management to prepare consolidated financial statements that are complete and accurate and in accordance with generally accepted accounting principles in the United States ('GAAP') and to establish satisfactory internal controls over financial reporting."

99. The Audit Committee Charter outlines the responsibilities of the Audit Committee, which include, among other things:

- Review and discuss with management and the internal and independent auditors internal controls over financial reporting and any report by management thereon and any opinion of the independent auditor relating thereto. Receive reports from management regarding management's quarterly evaluations of changes in internal controls over financial reporting and discuss with management and the internal and independent auditors as appropriate. Discuss, as appropriate, the adequacy of the Company's internal controls over financial reporting with the internal and independent auditors and management including, without limitation, reports from the Chief Executive Officer or the Chief Financial Officer regarding significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting, which could adversely affect the Company's ability to record, process, summarize, and report financial data, or any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls. Review and discuss, as appropriate, any major issues as to the adequacy of the Company's internal controls over financial reporting and any special audit steps adopted in light of material control deficiencies. Review the Chief Executive Officer and Chief Financial Officer certification process and the role of the Disclosure Committee;

- Review the results of internal audit's risk assessment, including the most significant risks facing the Company as well as how these risks have been addressed in the internal audit plan;

- Review the results of internal and independent audits and reviews of, and meet to review and discuss with management and the independent auditor prior to public dissemination, the Parent's annual audited consolidated financial statements and quarterly financial statements, including reviewing the Parent's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and other matters required by applicable PCAOB standards or under applicable legal, regulatory or NYSE requirements;

- Regularly review with the independent auditor significant issues regarding accounting principles and financial statement

presentations, including (i) any significant changes in the Company's selection or application of accounting principles; (ii) analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and (iii) any significant communications between the independent audit team and the independent auditor's national office in respect of auditing or accounting issues presented by the engagement;

100.    In relevant part, the Audit Committee Charter states the following responsibilities, under a section titled, "Oversight of Compliance with Legal and Regulatory Requirements":

- When deemed appropriate, review with management and the independent auditor the Bank's compliance with laws and regulations and review with the Company's General Counsel, or appropriate delegates, legal, disclosure or other matters that may have a material impact on the Company's consolidated financial statements or on the Company's compliance policies.

- Review any material reports or inquiries received from, and any reports of examination of, federal and state financial institution regulatory authorities and management's response thereto. Obtain, review and evaluate reports from management with respect to the Company's compliance with applicable legal and regulatory requirements, and the Company's Code of Ethics and Business Conduct. Discuss with management whether or not there have been any violations of such laws, regulations, or codes of conduct that could materially impact the Company's financial statements. The Company's Chief Compliance Officer shall have the authority to communicate personally to the Committee promptly on any matter involving criminal conduct or potential criminal conduct and, at least annually, shall report to the Committee on the implementation and effectiveness of the Company's compliance program. Establish procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters; and (ii) the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

- Discuss with management and the independent auditor any correspondence with regulators or governmental agencies, any

external or employee complaints, including complaints regarding accounting, internal accounting controls, or auditing matters, or published reports that raise material issues regarding the Company's financial statements or accounting policies, or other material complaint matters which affect the Bank, and receive summaries of corrective action plans and timetables.

- Review and discuss any reports concerning material violations submitted to the Committee by Company attorneys or outside counsel pursuant to the SEC attorney professional responsibility rules or otherwise.

101.    In violation of the Audit Committee Charter, Defendants Duncan, Eazor, and Rawlinson conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, Defendants Duncan, Eazor, and Rawlinson failed to maintain the accuracy of Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

102.    Discover is a financial services company split into two segments, Digital Banking and Payment Services. Digital Banking encompasses consumer banking and lending products such as credit cards, private student loans, personal loans, home loans, and deposit products. Payment Services encompasses the PULSE network which allows financial institutions to issue debit cards to access ATMs and Diners Club International,

which is a global payments network of financial institutions that issue Diners Club branded charge cards.

103.   Since Discover is a bank holding company under the Bank Holding Company Act of 1956, as well as a financial holding company under the Gramm-Leach-Bliley Act, the Company is subject to regulatory oversight by the Federal Reserve and is subject to heightened risk management, compliance, and internal controls procedures.

104.   During the Relevant Period, Defendants publicly maintained that Discover operated a formidable risk management program and utilized sophisticated compliance procedures, especially regarding the Company's consumer credit card and private student loan divisions.

105.   Also during the Relevant Period, Discover's Board facilitated an immense share repurchase program. Between March 2021 and June 2023, the Company repurchased over 58 million shares at a cost of over $6.4 billion.

### **False and Misleading Statements**

#### ***February 20, 2019 Form 10-K***

106.   On February 20, 2019, the Company filed its annual report with the SEC for the fiscal quarter and year ended December 31, 2018 on Form 10-K (the "2018 10-K"). The 2018 10-K was signed by Defendants Hochschild, Graf, Bush, Glassman, Moskow, Aronin, Case, Duncan, Eazor, Maheras, and Thierer, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Hochschild and Graf attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the

Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

107.    The 2018 10-K touted Discover's vast and elaborate "enterprise-wide risk management framework [used] to identify, measure, monitor, manage and report risks that affect or could affect the achievement of our strategic, financial and other objectives." The 2018 10-K further stated that "[Discover's] enterprise risk management philosophy is expressed through five key principles that guide our approach to risk management: Comprehensiveness, Accountability, Independence, Defined Risk Appetite and Transparency."

108.    The 2018 10-K represented to investors that Discover's risk management system "is designed to be comprehensive with respect to our business units and their control and support functions, and across all risk types"; and that "[w]e structure accountability across three lines of defense along the principles of risk management execution, oversight and independent validation."

109.    In relevant part, the 2018 10-K highlighted the following aspect of Discover's risk management system:

> [E]ach line of business is responsible for managing risks inherent in its business with appropriate oversight from our senior management and Board of Directors. Various committees are in place to oversee the management of risks across our Company. We seek to apply operating principles consistently to each committee. These operating principles are detailed in committee charters, which are approved by the Risk Committee. Our banking subsidiaries have their own risk governance, compliance, auditing and other requirements. Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

110.    The 2018 10-K also stated the following about the Company's credit risk management system:

Credit risk management is a critical component of our management and growth strategy. Credit risk refers to the risk of loss arising from borrower default when borrowers are unable or unwilling to meet their financial obligations to us. Our credit risk arising from consumer lending products is generally highly diversified across millions of accounts without significant individual exposures. We manage credit risk primarily based on customer segments and product types.

\* \* \*

Credit Risk Management is responsible for (i) developing, validating and implementing credit policy criteria and predictive loan origination and servicing models in order to optimize the profitability of Company lending activities, (ii) ensuring adherence to our credit risk policies and approval limits, and that departmental policies, procedures, and internal controls are consistent with the standards defined by the Company, (iii) ensuring that we manage credit risk within approved limits, and (iv) monitoring performance for both new and existing consumer loan products and portfolios.

111.     In addition, the 2018 10-K stated that Discover's "Chief Executive Officer ('CEO') is ultimately responsible for risk management within our Company" and that, "[i]n that capacity, the CEO establishes a risk management culture throughout our Company and ensures that businesses operate in accordance with this risk culture."

112.     Regarding other "Risk Categories," the 2018 10-K stated, in relevant part:

*Credit Risk*

Our credit risk arises from the potential that a borrower or counterparty will fail to perform on an obligation. Our credit risk includes consumer credit risk and counterparty credit risk. Consumer credit risk is primarily incurred by Discover Bank through the issuance of (i) unsecured credit including credit cards, student loans and personal loans and (ii) secured credit including secured credit cards, deposit secured loans and home equity loans. Counterparty credit risk is incurred through a number of activities including settlement, certain marketing programs, treasury and asset/liability management, network incentive programs, guarantors, vendor relationships and insurers.

\* \* \*

*Operational Risk*

Operational risk is defined as the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events.

Operational risk is inherent in all our businesses. Operational risk categories incorporate all of the operational loss event-type categories set forth by the BCBS [Basel Committee on Banking Supervision], which include the following: (i) internal fraud, (ii) external fraud, (iii) employment practices and workplace safety, (iv) clients, products and business practices, (v) damage to physical assets, (vi) business disruption and system failures, and (vii) execution, delivery and process management.

*Compliance Risk*

Compliance risk is the operational risk of legal or regulatory sanctions, financial loss or damage to reputation resulting from failure to comply with laws, regulations, rules, other regulatory requirements, or codes of conduct and other standards of self-regulatory organizations applicable to us. Compliance risk exposures are actively and primarily managed by our business units in conjunction with our compliance department. Our compliance program governs the management of compliance risk. Our Risk Committee and Compliance Committee oversee our compliance program.

*Legal Risk*

Legal risk arises from the potential that unenforceable contracts, lawsuits or adverse judgments can disrupt or otherwise negatively affect our operations or condition. These risks are inherent in all of our businesses. Legal risk exposures are actively and primarily managed by our business units in conjunction with our law department. Our Risk Committee and Compliance Committee oversee our legal risk management. Specifically, the law department is responsible for providing advice, interpreting and identifying developments regarding laws, regulations, regulatory guidance and litigation, and setting standards for communicating relevant changes to corporate compliance, the business and internal audit. The law department also identifies and communicates legal risk associated with new products and business practices.

**February 26, 2020 Form 10-K**

113.    On February 26, 2020, the Company filed its annual report with the SEC

for the fiscal quarter and year ended December 31, 2019 on Form 10-K (the "2019 10-K").

The 2019 10-K was signed by Defendants Hochschild, Greene, Bush, Glassman, Moskow,

Aronin, Case, Duncan, Eazor, Maheras, Thierer, and Wong and contained certifications

pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by

Defendants Hochschild and Greene attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

114. The 2019 10-K again noted Discover's vast and elaborate "enterprise-wide risk management framework." The 2019 10-K also reiterated substantively the same statements made in the 2018 10-K referenced above in ¶¶ 107-112 about Discover's compliance systems, its culture emphasizing risk management, and Defendant Hochschild's prominent role as a leader embodying Discover's commitment to risk management.

### February 17, 2021 Form 10-K

115. On February 17, 2021, the Company filed its annual report with the SEC for the fiscal quarter and year ended December 31, 2020 on Form 10-K (the "2020 10-K"). The 2020 10-K was signed by Defendants Hochschild, Greene, Bush, Glassman, Moskow, Aronin, Case, Duncan, Eazor, Maheras, Thierer, and Wong and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

116. The 2020 10-K again noted Discover's vast and elaborate "enterprise-wide risk management framework." The 2020 10-K also reiterated substantively the same statements made in the 2018 10-K referenced above in ¶¶ 107-112 about Discover's

compliance systems, its culture emphasizing risk management, and Defendant Hochschild's prominent role as a leader embodying Discover's commitment to risk management.

### February 24, 2022 Form 10-K

117. On February 24, 2022, the Company filed its annual report with the SEC for the fiscal quarter and year ended December 31, 2021 on Form 10-K (the "2021 10-K"). The 2021 10-K was signed by Defendants Hochschild, Greene, Bush, Glassman, Moskow, Aronin, Case, Duncan, Eazor, Maheras, Rawlinson, Thierer, and Wong and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

118. The 2021 10-K again noted Discover's vast and elaborate "enterprise-wide risk management framework." The 2021 10-K also reiterated substantively the same statements made in the 2018 10-K referenced above in ¶¶ 107-112 about Discover's compliance systems, its culture emphasizing risk management, and Defendant Hochschild's prominent role as a leader embodying Discover's commitment to risk management.

119. The statements referenced in ¶¶ 106-118 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) Discover did not have sufficient or effective risk management or compliance controls and

procedures; (2) Discover did not comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### *2022 Proxy Statement*

120. On March 25, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Aronin, Bush, Glassman, Moskow, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

121. The 2022 Proxy Statement called for Company shareholders to vote to: (1) elect Defendants Aronin, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong to the Board; (2) approve named executive officer compensation on an advisory, non-binding basis; and (3) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

122. Regarding the Company's Code of Ethics, the 2022 Proxy Statement provided, in relevant part:

> The Company maintains a Code of Ethics and Business Conduct applicable to all directors, officers and employees, including senior financial officers, and provides a statement of Discover's policies for conducting business legally and ethically. The Code of Ethics and Business Conduct is available without charge through the investor relations page of our internet site, www.discover.com, or by writing to the attention of: Investor Relations,

Discover Financial Services, 2500 Lake Cook Road, Riverwoods, Illinois 60015. Any waivers of the provisions of this Code of Ethics and Business Conduct for directors or executive officers may be granted only in exceptional circumstances by the Board, or an authorized committee thereof, and will be promptly disclosed to the Company's shareholders as may be required under the Securities and Exchange Commission ("SEC") or NYSE rules.

123.    Regarding the Board's "Role in Risk Oversight," the 2022 Proxy Statement provided, in relevant part:

The Board is responsible for approving the Company's enterprise-wide risk management framework, which is described in the Company's Enterprise Risk Management Policy and certain additional risk management policies. The Board receives reports of material exceptions to such policies. The Board has also delegated certain of its risk oversight responsibilities to its committees and regularly receives reports from the committees on risk management matters. Additionally, the Board approves the risk appetite and limits, and capital targets and thresholds of the Company. It also appoints the Chief Risk Officer, Chief Compliance Officer, Chief Audit Executive and other risk management function leaders, as appropriate. The Board regularly devotes time during its meetings to review and discuss the most significant risks facing the Company, and management's responses to those risks. During these discussions, the CEO, the Chief Risk Officer, the General Counsel and/or the Chief Financial Officer present management's assessment of risks, a description of the most significant risks facing the Company, and any mitigating factors and plans or practices in place to address and monitor those risks. Within these discussions, the Board receives updates from senior executives including the Chief Risk Officer and the Chief Information Security Officer on the risks posed to the Company by cybersecurity threats and the Company's information security program, including the results of tabletop simulations performed by management. In addition to these discussions, the Board receives annual information security training. The Board has also received regular updates on the continued impact of the COVID-19 pandemic on the Company, including credit quality, loan growth and sales volumes, personnel and business continuity plans, and legal and regulatory developments in response to the pandemic.

124.    Defendants Aronin, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong caused the 2022 Proxy Statement to be false and misleading by failing to disclose that: (1) Discover did not have sufficient or effective risk management

or compliance controls and procedures; (2) Discover did not comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

125. The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, its Code of Ethics was not followed, as the Individual Defendants violated the Code of Ethics, including by allowing false and misleading statements to be issued to the investing public.

126. As a result of Defendants Aronin, Case, Duncan, Eazor, Hochschild, Bush, Glassman, Moskow, Maheras, Rawlinson, Thierer, and Wong causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Aronin, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong to the Board, allowing them to continue to breach their fiduciary duties to the Company; (2) approve named executive officer compensation on an advisory, non-binding basis; and (3) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

**The Truth Begins to Emerge, While False and Misleading Statements Continue**

*July 20, 2022 Press Release*

127.    On July 20, 2022, after the market closed, Discover issued a press release that announced the Company's financial results for the second quarter of 2022. In addition, the press release disclosed that Discover had launched an internal investigation into its student loan servicing division as a result of compliance issues at the Company. The press release provided, in relevant part:

> The company is suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters. The investigation is ongoing and is being conducted by a board-appointed independent special committee.

128.    On this news, the price per share of Discover stock fell $9.80, or 8.93%, from its closing price on July 20, 2022 of $109.80 per share to close on July 21, 2022 at $100.00 per share. Despite the truth beginning to emerge and the Company's stock price declining as a result, Defendants continued to make false and misleading statements to the investing public about the Company's business, operations, and prospects, particularly in regards to the Company's risk management framework.

### *February 23, 2023 Form 10-K*

129.    On February 23, 2023, the Company filed its annual report with the SEC for the fiscal quarter and year ended December 31, 2022 on Form 10-K (the "2022 10-K"). The 2022 10-K was signed by Defendants Hochschild, Greene, Bush, Glassman, Moskow, Aronin, Case, Duncan, Eazor, Maheras, Rawlinson, Thierer, and Wong and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Hochschild and Greene attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's

internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

130.    The 2022 10-K again noted Discover's vast and elaborate "enterprise-wide risk management framework." The 2022 10-K also reiterated substantively the same statements made in the 2018 10-K referenced above in ¶¶ 97-102 about Discover's compliance systems, its culture emphasizing risk management, and Defendant Hochschild's prominent role as a leader embodying Discover's commitment to risk management.

131.    The statements referenced in ¶¶ 129-130 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) Discover did not have sufficient or effective risk management or compliance controls and procedures; (2) Discover did not comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

### The Truth Fully Emerges

*July 19, 2023 Press Release*

132.    On July 19, 2023, Discover issued a press release announcing its financial results for the second quarter of 2023. The press release revealed that: (1) Discover had

misclassified certain credit card products over an approximate fifteen-year period due to an admitted compliance failure; and (2) the Company had received a proposed consent order from the FDIC in connection with an unrelated regulatory matter. In particular, Discover stated that around halfway through 2007, the Company began misclassifying certain credit card accounts by misplacing customers into the Company's highest merchant and merchant acquirer pricing tier, stating, in relevant part:

**Background on Card Product Misclassification**

Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier. Incremental revenue resulting from this card product misclassification amounted to less than 1% of our cumulative discount and interchange revenue, gross, since that time, or less than two basis points as a percentage of sales over this timeframe. The misclassification affected pricing for certain merchants and merchant acquirers, but not for cardholders. Based on information available as of June 30, 2023, the Company determined that the revenue impact of the incorrect card product classification was not material to the consolidated financial statements of the Company for any of the impacted periods. Notwithstanding, for go-forward comparative purposes, the Company corrected the recognition of discount and interchange revenue as well as the related impacts to assets, liabilities and retained earnings in all prior periods presented. ***After adjusting for tax effects, the cumulative impact to beginning retained earnings as of April 1, 2023, was a decrease of $255 million, and the impact to net income for the quarter ended March 31, 2023, was a reduction of $8 million. As of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification.***

Management is taking actions to correct the card product misclassification going forward and to prepare a program to compensate affected direct merchants and merchant acquirers. However, given differences in individual merchant agreements, changes in network terms, and availability of historical data, it is difficult to determine the final amount of potential refunds at this time. An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing.

Discover is in discussions with its regulators regarding this matter and corporate governance and risk management. In addition, the Company received a proposed consent order from the FDIC in connection with consumer compliance. This proposed consent order does not include the card product classification matter. Additional supervisory actions could occur.

**Share Repurchase**

During the second quarter of 2023, the company repurchased approximately 6.8 million shares of common stock for $700 million. Shares of common stock outstanding declined by 2.6% from the prior quarter. The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending.

(Emphasis added.)

133. On this news, the price per share of Discover stock fell $19.40, or 15.92%, from its closing price on July 19, 2023 of $121.85 per share to close at $102.45 per share on July 20, 2023.

*August 14, 2023 Press Release*

134. On August 14, 2023, Discover issued another press release, this time announcing that the Company's Board and Defendant Hochschild "have agreed that Hochschild will step down as Chief Executive Officer and President and as a member of the Board," effective immediately. The press release stated, in relevant part:

[T]he Discover Board of Directors and [Defendant] Hochschild have agreed that Hochschild will step down as [CEO] and President and as a member of the Board. Hochschild will serve in an advisory role at the Company through the end of the year to ensure a smooth transition. John Owen, a member of the Board, has been appointed Interim CEO and President. These changes are effective immediately.

The Board has engaged a leading global executive search firm to commence a process to identify a permanent CEO and President.

Tom Maheras, Chair of the Board, said, "The Board and Roger have agreed that now is the right time to transition leadership, and we thank Roger for his 25 years of service to the Company. The Board is continuously focused

51

on Discover reaching its full potential across the business, including our commitment to enhancing compliance, risk management and corporate governance. We will continue to take actions to advance Discover's strategic priorities and generate high returns and capital."

### *August 14, 2023 Form 8-K*

135. On the same day, August 14, 2023, Discover filed a Form 8-K with the SEC that disclosed in an exhibit titled "Monthly Credit Card Charge-off and Delinquency Statistics as of and for each of the twenty-four months ended July 31, 2023." The 8-K revealed that the Company's credit card delinquency had increased to 3.00% for the twenty-four-month period ending July 31, 2023, which was considerably higher than the 2.86% mark the Company had for the twenty-four-month period ending June 31, 2023.

### *August 14, 2023 Seeking Alpha Article*

136. Also on August 14, 2023, *Seeking Alpha* published an article titled, "Discover credit card delinquency rate rises above prepandemic levels in July." The article stated the following, in relevant part:

- ***Discover Financial (NYSE:DFS) credit card delinquency rate increased to 3.00% in July from 2.86% in June and now stands at higher level than the prepandemic rate of 2.37% in July 2019.***

- The net charge-off rate, though, edged down to 3.77% in July 2023 from 3.80% in June, but was also higher than the July 2019 level of 3.23%.

- Ending loans increased to $95.6B from $94.0B in June.

- Separately, the consumer finance company said its CEO and president, Roger Hochschild, resigned effective Aug. 14.

- Discover (DFS) stock slid 5.2% in Monday after-hours trading.

(Emphasis added.)

### *August 15, 2023 Seeking Alpha Article*

137.     The next day, on August 15, 2023, *Seeking Alpha* published an article titled,

"Discover Financial stock sinks on sudden CEO exit amid regulatory concerns." The article

directly connected Defendant Hochschild's abrupt resignation to Discover's newly

disclosed regulatory and compliance problems, stating:

> Discover Financial (NYSE:DFS) stock slid 10% in Tuesday afternoon
> trading after the consumer finance company surprised investors by
> announcing the departure of its president and CEO, Roger Hochschild,
> without giving a reason for the sudden exit.
>
> Evercore ISI analyst John Pancari added Discover (DFS) to its Tactical
> Underperform List as a result. He's maintaining the stock's In Line rating
> at this time.
>
> Although the company didn't provide an explicit reason for Hochschild's
> departure, analysts suspect it's related to recent regulatory and risk
> oversight issues. "In discussing Hochschild's resignation in the 8K, DFS'
> Chair cited the board's commitment to enhancing compliance, risk
> management and corporate governance," Pancari wrote in a note to clients.
>
> In Discover's (DFS) Q2 results, released on July 19, the company disclosed
> that it took a $365M charge to provide refunds to merchants and merchant
> acquirers for the card misclassification issue. It also said it's pausing its
> stock buybacks while it reviews its compliance, risk management, and
> corporate governance practices.
>
> Pancari sees the risk of further regulatory actions persisting and expects the
> review to increase expenses and weight on shares.
>
> Wolfe Research analyst Bill Carcache also expects the regulatory issues,
> including a recent consent order, may have triggered the CEO change.
> "While the company has not explicitly provided a reason, several internal
> control failures that occurred under Hochschild's watch may have been
> behind his departure," the analyst said.
>
> Discover's (DFS) 10-Q, on July 28, disclosed that it's in talks with
> regulators regarding the product misclassification as well as corporate
> governance and risk management. "DFS's 10Q also noted that the company
> expects these discussions will likely result in enforcement actions," said
> Carcache.

138.    On this news, the price per share of Discover stock fell $9.69, or 9.44%, from its closing price on August 14, 2023 of $102.65 per share to close on August 15, 2023 at $92.96 per share.

## SUBSEQUENT DEVELOPMENTS

### *August 17, 2023 Earnings Call*

139.    Two days later, on August 17, 2023, during an earnings call with investors and analysts, Discover's highest officers admitted that the Company was "paying the price" for not investing enough in compliance. During the call, newly named Interim CEO John Owen ("Owen") and Defendant Greene maintained that Defendant Hochschild's swift exit signaled a new commitment to compliance for the Company. Owen stated that Discover had brought on more than two hundred compliance employees in the preceding months and replaced almost half of the Company's top management. Defendant Greene added that Discover was now intent on "investing in the right areas, getting the right people in place and driving accountability and ensuring that we don't put profits before compliance excellence." With these admissions, Defendants effectively corroborated *Seeking Alpha*'s concerns from the August 15, 2023 article.

## Repurchases During the Relevant Period

140.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of ***over $6.4 billion*** to repurchase approximately 58,004,324 shares of its own common stock at artificially inflated prices from March 2021 through June 2023.

141.    According to the Form 10-Q the Company filed with the SEC on May 4, 2021 for the quarterly period ended March 31, 2021 (the "1Q 2021 10-Q"), between March 1, 2021 and March 31, 2021, the Company purchased 527,918 shares of its common stock for approximately $51,113,021 at an average price of $96.82 per share.

142.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $2,037,764 for repurchases of its own stock between March 1, 2021 and March 31, 2021.

143.    According to the Form 10-Q the Company filed with the SEC on July 29, 2021 for the quarterly period ended June 30, 2021 (the "2Q 2021 10-Q"), between April 1, 2021 and June 30, 2021, the Company purchased 4,840,329 shares of its common stock for approximately $550,006,584 at an average price of $113.63 per share.

144.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $100,049,600 for repurchases of its own stock between April 1, 2021 and June 30, 2021.

145.    According to the Form 10-Q the Company filed with the SEC on October 28, 2021 for the quarterly period ended September 30, 2021 (the "3Q 2021 10-Q"), between July 1, 2021 and September 30, 2021, the Company purchased 6,521,450 shares of its common stock for approximately $812,898,743 at an average price of $124.65 per share.

146.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $206,664,750 for repurchases of its own stock between July 1, 2021 and September 30, 2021.

147.    According to the 2021 10-K, between October 1, 2021 and December 31, 2021, the Company purchased 6,481,909 shares of its common stock for approximately $764,994,900 at an average price of $118.02 per share.

148.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $162,436,640 for repurchases of its own stock between October 1, 2021 and December 31, 2021.

149.    According to the Form 10-Q the Company filed with the SEC on April 28, 2022 for the quarterly period ended March 31, 2022 (the "1Q 2022 10-Q"), between January 1, 2022 and March 31, 2022, the Company purchased 7,805,627 shares of its common stock for approximately $916,770,891 at an average price of $117.45 per share.

150.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $191,159,805 for repurchases of its own stock between January 1, 2022 and March 31, 2022.

151.    According to the Form 10-Q the Company filed with the SEC on July 27, 2022 for the quarterly period ended June 30, 2022 (the "2Q 2022 10-Q"), between April 1, 2022 and June 30, 2022, the Company purchased 5,747,710 shares of its common stock for approximately $600,003,447 at an average price of $104.39 per share.

152.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $65,696,325 for repurchases of its own stock between April 1, 2022 and June 30, 2022.

153.    According to the Form 10-Q the Company filed with the SEC on October 27, 2022 for the quarterly period ended September 30, 2022 (the "3Q 2022 10-Q"), between

July 1, 2022 and September 30, 2022, the Company purchased 2,099,205 shares of its common stock for approximately $210,067,444 at an average price of $104.39 per share.

154.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $14,925,348 for repurchases of its own stock between July 1, 2022 and September 30, 2022.

155.    According to the 2022 10-K, between October 1, 2022 and December 31, 2022, the Company purchased 5,882,711 shares of its common stock for approximately $600,271,830 at an average price of $102.04 per share.

156.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $53,415,016 for repurchases of its own stock between October 1, 2022 and December 31, 2022.

157.    According to the Form 10-Q the Company filed with the SEC on April 25, 2023 for the quarterly period ended March 31, 2023 (the "1Q 2023 10-Q"), between January 1, 2023 and March 31, 2023, the Company purchased 11,281,133 shares of its common stock for approximately $1,199,974,117 at an average price of $106.37 per share.

158.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $151,279,994 for repurchases of its own stock between January 1, 2022 and March 31, 2022.

159.    According to the Form 10-Q the Company filed with the SEC on July 28, 2023 for the quarterly period ended June 30, 2023 (the "2Q 2023 10-Q"), between April 1, 2023 and June 30, 2023, the Company purchased 6,816,332 shares of its common stock for approximately $699,969,133 at an average price of $102.69 per share.

160.    As the Company's stock was actually worth only $92.96 per share, the price at closing on August 15, 2023, the Company overpaid by approximately $66,322,910 for repurchases of its own stock between April 1, 2023 and June 30, 2023.

161.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by *over $1.0 billion*.

## DAMAGES TO DISCOVER

162.    As a direct and proximate result of the Individual Defendants' conduct, Discover will lose and expend many millions of dollars.

163.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company; its former CEO; its EVP, CFO; and its former EVP, CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

164.    Additionally, these expenditures include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

165.    Further, the Company was damaged by the false and misleading statements made in the 2022 Proxy Statement, as the 2022 Proxy Statement induced shareholders to reelect Defendants Aronin, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong to the Board, who then continued to harm the Company, giving rise to actionable Section 14(a) claims and breach of fiduciary duty claims.

166.    As a direct and proximate result of the Individual Defendants' conduct, Discover has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the

Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

167.     Plaintiff brings this action derivatively and for the benefit of Discover to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Discover, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

168.     Discover is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

169.     Plaintiff is, and has been at all relevant times, a shareholder of Discover. Plaintiff will adequately and fairly represent the interests of Discover in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

170.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

171.     A pre-suit demand on the Board of Discover is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following thirteen individuals: Defendants Aronin, Case, Duncan, Eazor, Maheras, Rawlinson, Thierer, and Wong (the "Director-Defendants") along with nonparties John B. Owen, Beverly A. Sibblies, Kathy Lonowski, Daniela O'Leary-Gill, and J. Michael Shepard (collectively,

with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors who are on the Board at the time this action is commenced.

172. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

173. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

174. The Director-Defendants knew of the falsity of the misleading statements at the time they were made. Risk management and compliance protocols, especially regarding credit card products and student loan servicing, are an integral part of the Company's business. As an entity operating in the financial industry that is subject to heightened federal regulations, maintaining adequate risk management and compliance procedures lie at the core operations of Discover. The maintenance of risk management and compliance procedures was highly material to the Company's core operations, as

evidenced by numerous references in the Company's public filings and press releases issued during the Relevant Period.

175.    As Board members of Discover, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Discover, the Director-Defendants must have been aware of the material facts regarding the issues plaguing Discover's risk management systems and compliance procedures.

176.    This inference of actual knowledge of the misleading statements and omissions at issue is supported by the sudden and unexplained departure of Defendant Hochschild as President, CEO and director of Discover due to a sudden decision by Defendant Hochschild and the Board, on the same day the truth fully emerged, on August 14, 2023.

177.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Discover to issue materially false and misleading statements. Specifically, the Director-Defendants caused Discover to issue false and misleading statements which were intended to make Discover appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

178.    Additional reasons that demand on Defendant Aronin is futile follow. Defendant Aronin has served as a Company director since September 2007. He also serves

as a member of the Compensation and Leadership Development Committee. He receives handsome compensation for his role at the Company, including $290,067 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Aronin signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions, as alleged above. For these reasons, too, Defendant Aronin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179. Additional reasons that demand on Defendant Case is futile follow. Defendant Case has served as a Company director since 2007. He also serves as the Chair of the Compensation and Leadership Development Committee. He receives handsome compensation for his role at the Company, including $300,067 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Case signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and

contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Case breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.   Additional reasons that demand on Defendant Duncan is futile follow. Defendant Duncan has served as a Company director since 2014. She also serves as a member of the Audit Committee and Nominating, Governance and Public Responsibility Committee. She receives handsome compensation for her role at the Company, including $325,067 in 2022. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Duncan signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. She also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Duncan breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.   Additional reasons that demand on Defendant Eazor is futile follow. Defendant Eazor has served as a Company director since 2016. He also serves as a member of the Audit Committee. He receives handsome compensation for his role at the Company, including $295,067 in 2022. As a trusted, long-time Company director, he conducted little,

if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Eazor signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Eazor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Maheras is futile follow. Defendant Maheras has served as a Company director since 2008 and as Independent Chairman since May 2020. He also serves as a member of the Risk Oversight Committee. He receives handsome compensation for his role at the Company, including $505,067 in 2022. As a trusted, long-time Company director and as the Board's Independent Chairman, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Maheras signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too,

Defendant Maheras breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Rawlinson is futile follow. Defendant Rawlinson has served as a Company director since February 2021. He also serves as a member of the Audit Committee. He receives handsome compensation for his role at the Company, including $295,067 in 2022. As a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Rawlinson signed, and thus personally made, the false and misleading statements in the 2021 10-K and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Rawlinson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Thierer is futile follow. Defendant Thierer has served as a Company director since 2013. He also serves as a member of the Compensation and Leadership Development Committee and as a member of the Nominating, Governance and Public Responsibility Committee. He receives handsome compensation for his role at the Company, including $300,067 in 2022. As a trusted, long-time Company director, he conducted little, if any, oversight of the

Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Thierer signed, and thus personally made, the false and misleading statements in the 2018 10-K, 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. He also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to his re-election to the Board, as alleged above. For these reasons, too, Defendant Thierer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185. Additional reasons that demand on Defendant Wong is futile follow. Defendant Wong has served as a Company director since 2019. She also serves as a member of the Risk Oversight Committee. She receives handsome compensation for her role at the Company, including $295,067 in 2022. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Wong signed, and thus personally made, the false and misleading statements in the 2019 10-K, 2020 10-K, 2021 10-K, and 2022 10-K that are referenced herein. She also solicited the 2022 Proxy Statement, which contained material misrepresentations and omissions and contributed to her re-election to the Board, as alleged above. For these reasons, too, Defendant Wong

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

186.    Additional reasons that demand on the Board is futile follow.

187.    Each of the Director-Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay *by approximately $1.0 billion dollars* for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

188.    Defendants Duncan, Eazor, and Rawlinson (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit

Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

189. All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

190. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

191. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's

charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

192.     The acts complained of herein constitute violations of fiduciary duties owed by Discover's officers and directors, and these acts are incapable of ratification.

193.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Discover. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Discover, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

194.     If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Discover to sue the Individual Defendants named herein, since,

if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

195.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### **Against Individual Defendants for Violations of**
### **Section 14(a) of the Securities Exchange Act of 1934**

196.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

197.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

198.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

199.    Under the direction and watch of the Director-Defendants, the 2022 Proxy Statement failed to disclose that: (1) Discover did not have sufficient or effective risk management or compliance controls and procedures; (2) Discover did not comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate;  and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

200.    Under the direction and watch of the Director-Defendants, the 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

201.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement, including election of

directors, advisory approval of executive compensation, and ratification of the appointment of an independent registered public accounting firm.

202. As a result of the material misstatements and omissions contained in the 2022 Proxy Statement, Company shareholders voted to re-elect Defendants Aronin, Case, Duncan, Eazor, Hochschild, Maheras, Rawlinson, Thierer, and Wong to the Board, thus allowing them to continue breaching their fiduciary duties to Discover.

203. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022 Proxy Statement.

204. Plaintiff, on behalf of Discover, has no adequate remedy at law.

## SECOND CLAIM

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

205. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

206. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Discover. Not only is Discover now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Discover by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase tens of millions of its own shares at artificially inflated prices, damaging Discover.

207. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate

commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

208.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Discover not misleading.

209.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Discover.

210.     The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

211.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

212.    Plaintiff, on behalf of Discover, has no adequate remedy at law.

## THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

213.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

214.    The Individual Defendants, by virtue of their positions with Discover and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Discover and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Discover to engage in the illegal conduct and practices complained of herein.

215.    Plaintiff, on behalf of Discover, has no adequate remedy at law.

## FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

216.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

217.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Discover's business and affairs.

218.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

219. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Discover.

220. In breach of their fiduciary duties owed to Discover, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Discover did not have sufficient or effective risk management or compliance controls and procedures; (2) Discover did not comply with student loan servicing standards and misclassified credit card customer accounts; (3) as a result, Discover overcharged customers; (4) Discover struggled to contain its skyrocketing credit card delinquency rate; and (4) once these failures were disclosed, the Company would be subjected to financial risk, enhanced regulatory oversight, and reputational harm. As a result of the foregoing, statements about the Company's business, operations and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

221. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

222. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

223. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase tens

of millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while one of the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $568,000.

224.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Discover's securities.

225.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Discover's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

226.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

227.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Discover has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228.    Plaintiff, on behalf of Discover, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

229.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Discover.

231.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Discover that was tied to the performance or artificially inflated valuation of Discover, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

232.    Plaintiff, as a shareholder and a representative of Discover, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any

performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

233.     Plaintiff, on behalf of Discover, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

234.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

235.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Discover, for which they are legally responsible.

236.     As a direct and proximate result of the Individual Defendants' abuse of control, Discover has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

237.     Plaintiff, on behalf of Discover, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

238.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Discover in a manner consistent with the operations of a publicly held corporation.

240. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Discover has sustained and will continue to sustain significant damages.

241. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

242. Plaintiff, on behalf of Discover, has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

243. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

245. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Discover to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

246. In addition, the Individual Defendants caused the Company to repurchase tens of millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

247. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

248.    Plaintiff, on behalf of Discover, has no adequate remedy at law.

### PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Discover, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Discover;

(c)    Determining and awarding to Discover the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Discover and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Discover and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Discover to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of

compliance with applicable laws, rules, and regulations;

      (e)    Awarding Discover restitution from Individual Defendants, and each of them;

      (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (g)    Granting such other and further relief as the Court may deem just and proper.

Dated: September 19, 2023           Respectfully submitted,

                    *s/ Timothy Brown*

                 Timothy W. Brown
                 **THE BROWN LAW FIRM, P.C.**
                 767 Third Avenue, Suite 2501
                 New York, NY 10017
                 Tel: (516) 922-5427
                 Fax: (516) 344-6204
                 tbrown@thebrownlawfirm.net

                 *Counsel for Plaintiff*

## **VERIFICATION**

I, Stuart Swaziek, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 19 __ day of September, 2023.

DocuSigned by:

*Stuart Swaziek*
644E34F514284D1...

Stuart Swaziek